IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| TRACY REYNOLDS CREEKMORE, | ) Civil Action No. 5:11-256-RMG-KDW |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) REPORT AND |
| | ) RECOMMENDATION |
| MICHAEL J. ASTRUE, | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Income Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I. Procedural History

Plaintiff protectively filed her DIB application on November 7, 2007, alleging that her disability began on July 15, 2007 (the alleged onset of disability or "AOD").[1]

---

[1] Plaintiff previously filed a DIB application in March 2006, alleging a disability onset date of June 21, 2005. *See* Tr. 114. Few documents related to that application appear in the current administrative record. It does not appear that Plaintiff pursued this claim beyond its reconsideration denial on August 10, 2006, Tr. 60, or that she reopened it with the instant application. *See* Tr. 60, 66-70 (denial and reconsideration denial of prior application with AOD of June 21, 2005).

Tr. 120, 216. Her application was denied initially and upon reconsideration. Tr. 74, 86. At Plaintiff's request, an administrative law judge ("ALJ") held a hearing on August 21, 2009, at which Plaintiff and a vocational expert ("VE") testified. *See* Tr. 14. As Plaintiff testified at the hearing, she is a high school graduate and was forty-two years old on the date of her administrative hearing. Tr. 29, 32. She has past relevant work ("PRW") as a vacuum center helper. Tr. 22, 54.

The ALJ issued an unfavorable decision dated September 4, 2009. Tr. 16. The Appeals Council denied Plaintiff's request for review of that decision, Tr. 1, making it the final decision for purposes of judicial review. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on February 1, 2011. ECF No. 1.

II. Discussion

A. The ALJ's Findings

In his September 4, 2009 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.

2. The claimant has not engaged in substantial gainful activity since July 15, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe combination of impairments: bipolar affective disorder, anxiety disorder, depression, and history of alcohol and drug abuse (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: never climb ladders, ropes or scaffolds, perform all other postural activities frequently, and avoid even

moderate exposure to hazards. She is limited to simple repetitive routine tasks for at least 2 hour periods, and she would be capable of frequently interacting with the general public.

6. The claimant is capable of performing past relevant work as a vacuum center helper. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from July 15, 2007, through the date of this decision (20 CFR 404.1520(f)).

Tr. 18-23.

B. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings; (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant

numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146, n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the

Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id., Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. See *Vitek*, 428 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C. Analysis

Plaintiff argues that the ALJ erred in the following ways: (1) by failing to properly weigh the medical opinions of record; (2) by improperly assessing her credibility; and (3) by relying on the VE's response to a flawed hypothetical. The Commissioner counters that the ALJ's decision is supported by substantial evidence and contains no harmful legal error.

1. The ALJ's Consideration of Record Medical Opinions

Plaintiff first argues the ALJ did not appropriately consider the medical opinions of record, specifically arguing the ALJ erred by failing to accord controlling weight to two of the three record opinions rendered by her treating psychiatrist, Khizar Kahn, M.D. In evaluating that claim, the court reviews Dr. Kahn's opinions as well as other relevant expert opinions of record.

a. Dr. Kahn's Treatment of and Opinions Regarding Plaintiff

Plaintiff started seeing psychiatrist Khizar Khan on April 5, 2006, and he was her treating psychiatrist from her AOD of July 15, 2007, through September 4, 2009, the date of the ALJ's decision (hereinafter, the "relevant period").

Plaintiff saw Dr. Khan for a "med check" on May 24, 2007. Tr. 498. She told him that she was doing well, and that both work and home were "good." *Id.* Dr. Khan described Plaintiff as pleasant, groomed, cooperative, and goal-oriented, with productive speech and a fair affect. He continued her medications from her previous visit. Plaintiff's diagnosis was "Bipolar Affective Disorder, Most recent depressed." *Id.*

Although Plaintiff was supposed to make a return visit three months later, she did not. Her next medical record, dated September 18, 2007, shows that she reported to the emergency department seeking alcohol detoxification.[2] Tr. 463-64. Her blood alcohol was 102 mg/dl (0.102%). Tr. 477. At her request, Plaintiff was discharged to her home on September 21, 2007. Tr. 491.

When Plaintiff next saw Dr. Khan, on October 9, 2007, she explained that she had quit working and, because she could not afford her medications, she cut down on some of them and

---

[2] In 1996, Congress eliminated benefits for disabilities resulting from alcoholism and/or drug abuse. Contract with America Advancement Act of 1996, Pub. L. 104-121, 110 Stat. 847; *see also* 20 C.F.R. § 404.1535.

stopped taking some altogether.[3]  Tr. 499.  Subsequently, Plaintiff became depressed and suffered difficulty in functioning.  Plaintiff reported that she still was not "taking all [her] medicines right," and was experiencing a worsening of her depression. *Id.*  Dr. Khan observed that Plaintiff was tearful and emotional, with a depressed mood and congruent affect.  He prescribed a medication regime and advised Plaintiff to return in two weeks.

Thereafter, Dr. Khan saw Plaintiff on October 24, 2007, and a month later on November 29, 2007.  At the October 24 visit, she reported "fair tolerability on medication," and that Lamictal[4] was "doing good" for her.  Tr. 500.  Plaintiff told Dr. Khan, "I feel I'm better" and "I feel [the medication] is doing good for me" *Id.*  Dr. Khan described Plaintiff as "calmer, cooperative, pleasant, smiling, goal oriented," with a restricted affect. *Id.*

When Plaintiff returned for follow-up on November 29, 2007, she said that she was "okay," but complained of being "real down" and "just depressed."  Tr. 501.  Plaintiff continued that she lacked energy and had difficulty motivating herself or being involved "in any productive activity." *Id.*

On January 3, 2008, Dr. Khan opined that Plaintiff continued "to struggle with symptoms of depression, social isolation, feeling sad, overwhelmed."  Tr. 787.  Dr. Khan completed a form on which he indicated that Plaintiff had "Poor or None" ability to follow work rules; relate to co-workers; deal with the public; deal with work stresses; function independently; and maintain attention/concentration. *Id.*  He added that she had "Fair" ability to understand, remember and

---

[3] "In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."  20 C.F.R. § 404.1530(a).

[4] "LAMICTAL is indicated for the maintenance treatment of Bipolar I Disorder to delay the time to occurrence of mood episodes (depression, mania, hypomania, mixed episodes) in adults (≥18 years of age) treated for acute mood episodes with standard therapy." *Physicians' Desk Reference* 1215 (PDR Network, LLC 66th ed. 2012) [hereinafter *PDR*].

carry out simple job instructions, in spite of "impaired attention/concentration, memory problems, thought organization." Tr. 788.

Plaintiff returned to Dr. Khan on January 8, 2008, still struggling with her mood, which she described as "'not great.'" Tr. 522. She was still socially isolated, had increased anxiety, and reported feeling "'more nervous and panicky.'" *Id.* Dr. Khan found her to be dysphoric,[5] sad and withdrawn, with a sad and dysphoric affect. He adjusted her medication dosages, and added Invega.[6]

When Plaintiff next saw Dr. Khan, on January 30, 2008, she indicated that Invega helped her mood to be more stable, although she complained of "'panicky feeling[s]'" and getting upset with herself. Tr. 752. Dr. Khan continued Plaintiff on her medication regimen, and noted it seemed to be helping Plaintiff's dysphoria, depression and panic attacks. *Id.*

On February 19, 2008, Plaintiff went to her general practitioner with complaints of sinus pressure and warts on her right hand. Tr. 775. She told the practitioner that she was going on a cruise. *Id.* Plaintiff saw Dr. Khan again on March 4, 2008, and told him she was "'doing okay,'" and that her moods were stable on Invega. Tr. 751. Dr. Khan continued her medications, and advised her to follow-up in two months. *Id.*

On April 14, 2008, Dr. Khan completed a form sent to him by the state disability agency that requested additional information in considering Plaintiff's claim. Tr. 528. Dr. Khan indicated that Plaintiff's thought process was intact; her thought content was appropriate; her

---

[5] "Dysphoria" is "[a] mood of general dissatisfaction, restlessness, depression, and anxiety; a feeling of unpleasantness or discomfort." *Stedman's Medical Dictionary* 599 (28th ed. 2006).

[6] Invega is indicated for treatment of schizophrenia and schizoaffective disorders. *PDR*, *supra note 7*, at 1496.

mood/affect was worried/anxious; and her attention/concentration and memory were adequate. He opined that Plaintiff was able to relate and communicate adequately. Dr. Khan added that Plaintiff had "insufficient" ability to handle stress, "fair" ability to follow simple instructions, and "fair" ability to interact appropriately with others. *Id.*

When Plaintiff saw Dr. Khan on April 30, 2008, she told him she was still doing "okay." Tr. 750. The doctor observed that she was pleasant, groomed, cooperative, and goal-oriented, although her speech was slightly under-productive and her affect was constricted. He continued her medications as before, and extended her follow-up to three months. *Id.*

When Plaintiff returned to Dr. Khan on August 19, 2008, she described her mood as "not too bad," and complained of a possible symptom of previously diagnosed obsessive-compulsive disorder ("OCD"). Tr. 749. Despite the complaint, Plaintiff told Dr. Kahn she did not want to change her medication dosage to address the symptom as she feared that mild sweating on Zoloft would increase. *Id.* Dr. Khan noted fair affect and productive speech, continued her medication regimen, and scheduled her return for four months. *Id.*

Plaintiff returned to Dr. Khan on December 18, 2008, reporting she felt "pretty good" overall, and "this is the best I've felt for a long long time." Tr. 748. The record indicates that Plaintiff was groomed, pleasant, smiling, cooperative and engaging, with productive speech and goal-oriented thought processes, and a brighter affect. Again, Dr. Khan continued Plaintiff's medications "as before," and had her follow-up in four months. *Id.*

Plaintiff returned to Dr. Khan on schedule, on April 1, 2009. She said that she was doing "okay," and although she had "some down times," they were "not excessive or worrisome." Tr. 791. Plaintiff was still experiencing an OCD symptom, but she still did not want to change her medications. She reported that she remained "overwhelmed," and felt unable to work

because of her limitations with attention and concentration and "difficulty dealing with stress in general." *Id.* The doctor noted that Plaintiff's thought processes were "somewhat interrupted," yet still goal-directed, and her affect was "constricted with some anxiety." *Id.* He made no adjustments to her medications, and advised Plaintiff to return in four months.

Plaintiff returned to Dr. Kahn on April 15, 2009, however. Tr. 790. Dr. Kahn noted Plaintiff was "seen for med check," and noted that an "[e]valuation [was] done for patient's ability to apply for disability." *Id.* Plaintiff reminded Dr. Khan that she had been sober since her detoxification in September 2007, and told him that she "[h]ad worked the longest in the past" for "Hitachi" from 1993 through 2002 or 2003.[7] *Id.* According to Dr. Kahn's notes, Plaintiff further stated as follows:

> In spite of her making efforts to go back to work, she has been unable to do so, because of limitations in her attention/concentration, focus, being overwhelmed when given tasks as well as feeling somewhat paranoid that people are after her when she is in social or work related situations.

*Id.* Dr. Khan wrote that Plaintiff was groomed, cooperative, and engaging, with productive speech and organized thought processes. He further described her as "guarded" and passive, with a constricted affect and anxiety. *Id.* Again, Dr. Khan continued Plaintiff's medications without change, and again scheduled her return for four months.

On April 15, 2009, Dr. Khan completed a form that was nearly identical to one completed in January 2008. *Compare* Tr. 784-86 *with* Tr. 787-89. His responses were similar in some respects. However, in January 2008, Dr. Khan had rated Plaintiff's ability to interact with supervisors as "Fair," but, in April 2009, he opined it was "Poor to limited." Tr. 784, 787. Dr. Khan believed that Plaintiff's ability to function independently had improved to "Fair" in 2009

---

[7] Plaintiff also reported that she worked for Hitachi from 1993 through 2001. Tr. 228 (Dec. 2007 Work History Rpt.).

from "Poor or None" in January 2008. In April 2009, Dr. Khan noted in his opinion that Plaintiff had "report[ed] feeling overwhelmed, difficulty with focus, paranoia in work setting." *Id.* As to Plaintiff's ability to "Understand, Remember, & Carry Out," Dr. Khan's responses were the same in January 2008 and April 2009. Tr. 785, 788. In his notes to the 2009 finding, Dr. Khan noted that Plaintiff "report[ed] difficulty [with] detailed instruction, completion tasks, focus is an issue, including feeling distracted." Tr. 785.

### b. State Agency Expert Opinions

During the administrative proceedings, psychological consultants[8] reviewed Plaintiff's records on behalf of the state disability agency.[9] On December 21, 2007, Craig Horn, Ph.D., opined that, although Plaintiff's impairments were severe, she would be able to perform "simple routine tasks away from [the] public." Tr. 514. On May 21, 2008, Xanthia Harkness opined that, although Plaintiff's symptoms had "worsened slightly" since her case had been reviewed initially, her severe impairments would not preclude the performance of "simple, unskilled work without frequent public contact." Tr. 541.

### c. The ALJ Did Not Err in His Evaluation of the Opinion Evidence

The ALJ reviewed each of Dr. Khan's three opinions, and gave "significant weight" to the second one, dated April 14, 2008, which Dr. Khan provided at the request of the state disability agency (the "state agency opinion"). *See* Tr. 528. The ALJ explained that this

---

[8] Although Plaintiff testified to some physical ailments, *see* Tr. 18, her disability application relies solely on psychological impairments, *see* Tr. 220.

[9] The initial disability determination is made by a state agency acting under the authority and supervision of the Commissioner. 42 U.S.C. § 421(a); 20 C.F.R. § 404.1503(a). Where there is evidence of a mental impairment, a qualified psychiatrist or psychologist performs a case review and residual functional capacity assessment. *See* 20 C.F.R. § 404.1615(d).

assessment was "consistent with the objective findings and the substantial evidence of record." Tr. 22. In support of his finding, the ALJ pointed to Dr. Khan's repeated observations that Plaintiff's thought process was goal-oriented and her mood was fair. The ALJ also noted that Plaintiff was "able to interact with others when she went on a Bahamas cruise with her husband."[10] *Id.* The ALJ further referred to Plaintiff's testimony that she went motorcycle riding and attended church, prepared meals, talked on the phone, did some housework, visited with family, and watched TV. Tr. 22. Moreover, the ALJ observed that Dr. Khan's other opinions tracked Plaintiff's subjective complaints rather than his own records. Tr. 22. *Cf. Johnson*, 434 F.3d at 657 (finding physician's opinion that was based on the claimant's subjective complaints could be rejected). Further, as discussed further below, the ALJ found Plaintiff's credibility to be "low." Tr. 22.

The regulations require all medical opinions in a case to be considered. 20 C.F.R. § 404.1527(b). "Courts typically 'accord greater weight to the testimony of a treating physician because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant.'" *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006) (internal citation omitted) (quoting *Johnson*, 434 F.3d at 654). "Although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). A treating physician's medical opinion will be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in

---

[10] The ALJ noted that, based on Plaintiff's testimony at the hearing, it was possible Plaintiff "had taken more than one vacation." Tr. 22 (noting records in which Plaintiff told Dr. Khan in March 2008 that she had recently returned from vacation as compared with hearing testimony that she went on cruise in "February or June or July of 2007").

the record. *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting 20 C.F.R. § 404.1527(d)(2)). In the face of "persuasive contrary evidence," the ALJ has the discretion to accord less than controlling weight to such opinion. *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). As succinctly explained by another court in the Fourth Circuit:

> This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays[ v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)]. . . .
>
> Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano,* 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527[(c)], if he sufficiently explains his rationale and if the record supports his findings.

*Owens v. Barnhart*, 400 F. Supp. 2d 885, 889-90 (W.D. Va. 2005).

Plaintiff complains that the ALJ "summarily dismissed" Dr. Khan's other opinions, "without stating what weight, if any, the ALJ gave the opinions." Pl.'s Br. 18. This argument is without merit. The ALJ discussed Dr. Kahn's other opinions in some detail, but explains they are contrary to his treating notes and finds those opinions cause Dr. Kahn to "impeach himself." Tr. 21-22. Further, the ALJ gave controlling weight to one of Dr. Kahn's opinions, which included his finding that the opinion was supported by the objective medical evidence and "not inconsistent with the other substantial evidence" of record. *Craig*, 76 F.3d at 590. Because the ALJ gave controlling weight to an opinion of the treating physician, he was not required to use the factors at 20 C.F.R. § 404.1527(c).[11]

---

[11] The factors are examining relationship, treatment relationship, supportability, consistency, specialization, and the catch-all, "[o]ther factors . . . which tend to support or contradict the opinion." 20 C.F.R. § 404.1527(c).

Plaintiff refers to SSR 96-2p, 61 Fed. Reg. 34,490-01, in her argument, but this Ruling provides,

> Although *it is not necessary in every case to evaluate each treating source medical opinion separately*, adjudicators must always be aware that *one or more of the opinions may be controlling while others may not.* Adjudicators must use judgment based on the facts of each case in determining whether, and the extent to which, it is necessary to address separately each medical opinion from a single source.

*Id.* at 34,491 (emphases added). The court is satisfied that the ALJ is in accord with SSR 96-2p; in affording the state agency opinion "significant weight," the ALJ "sufficiently explain[ed] his rationale" and cited to evidence in "the record support[ing] his findings." *Owens*, 400 F. Supp. 2d at 889–90. In so doing, he complied with SSR 96-2p's mandate to include in his unfavorable decision "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, . . . sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." 61 Fed. Reg. at 34, 492.

Plaintiff also takes issue with the ALJ's characterization that Dr. Khan "impeached himself" with "contradictory opinions," Tr. 15, and contends the state agency opinion "actually support[s]" the other two, Pl.'s Br. 19. The court disagrees.

The state agency opinion says that Plaintiff's thought process is "intact" instead of "distractible [sic]." Tr. 528. Dr. Khan's last opinion[12] repeats Plaintiff's "reports" that she has "difficulty with focus" and that "focus is an issue including feeling distracted." Tr. 785. The state agency opinion describes Plaintiff's thought content as "appropriate" instead of "paranoid." Tr. 528. The last opinion repeats Plaintiff's "report[]" that she has "paranoia in work setting."

---

[12] This Report will limit the comparison to the April 15, 2009 assessment only, as Plaintiff urges that the "most recent" opinion is the "most relevant." Pl.'s Resp. Br. 2.

Tr. 785. On the state agency form, Dr. Khan says that Plaintiff's attention/concentration are "adequate" instead of "poor," as he says in his last opinion. *Compare* Tr. 528, *with* Tr. 785. In the last opinion, Dr. Khan rates Plaintiff as "poor" in her ability to relate to co-workers, deal with the public, and interact with supervisors, Tr. 784-85; in the state agency opinion, he says that she has "fair" ability to "interact appropriately with others," Tr. 528. Although the state agency opinion and the last opinion are not contradictory in all respects, the state agency opinion does not "support" the last opinion.

Plaintiff asserts that if the opinions conflict, it is because they "reflect[] the opinion of Dr. Khan at the specific time he completed each form." Pl.'s Br. 19-20. But the value of a "treating physician" opinion, and one of the criteria in weighing it, is the source's ability to provide a "longitudinal picture" of the claimant's impairment. 20 C.F.R. § 404.1527(d)(2). In the several visits preceding and succeeding the state agency opinion, Plaintiff's mood was fairly stable; her visits had been reduced to once every four months; she was vacationing away from home, with others; and her medication regimen was unaltered. Thus, the state agency opinion presents a longitudinal view. For the doctor to base his opinion on Plaintiff's statements, rather than his records over the course of the previous several months, does not fit the regulation's criterion. *See also Craig*, 76 F.3d at 590 n.2 ("There is nothing objective about a doctor saying, without more, 'I observed my patient telling me she was in pain.'").

Plaintiff counters that Dr. Khan based his opinion on records from April 5, 2006, through July 29, 2009, but this period does not reflect the relevant period. In March 2006, Plaintiff filed her first disability application, Tr. 114, which was denied without appeal on August 10, 2006, Tr. 60. In fact, Plaintiff worked from August 7, 2006 through her AOD of July 15, 2007.[13] *See*

---

[13] Plaintiff's Disability Report indicates that July 15, 2007, was her last day of work, Tr. 220, but the hearing transcript reveals a date last worked of June 27, 2007, Tr. 33, 48.

Tr. 228; *see also* Tr. 498 ("work is going good").)  Thus, if Dr. Khan's opinion dates from April 5, 2006, through Plaintiff's AOD, it would indicate that Plaintiff is able to work despite the limitations the doctor described.  *See Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) ("Working generally demonstrates an ability to perform a substantial gainful activity.").

Although the relevant period started on July 15, 2007, Plaintiff did not see Dr. Khan until October 9, 2007, after being off her medications, abusing alcohol, and being medically detoxified.  Once Dr. Khan established Plaintiff on a medication regimen, his notes establish that she improved, such that they supported, and were consistent with, the state agency opinion.  *Cf. Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (if symptoms are, or can be, reasonably controlled by medication, they may not be considered disabling under the Act).

Plaintiff also briefly points to Dr. Khan's records from the period after the ALJ's September 4, 2009 decision as support for Dr. Khan's prior opinions. *See* Pl.'s Br. 21; *see also* Tr. 797 (notes of Pl.'s Jan. 14, 2012 office visit to Dr. Khan), 803-09 (Dr. Khan's records of Pl.'s Feb. through July 2010 office visits).  The Commissioner counters that the evidence does not indicate the ALJ's decision is not supported by substantial evidence. As the Commissioner notes, 20 C.F.R. § 404.970(b) provides that the Appeals Council is to consider additional evidence only if it is new, material, and "relates to the period on or before the date of the [ALJ] decision." Def.'s Br. 19-20 (citing 20 C.F.R. § 404.970(b)).

Here, because the Appeals Council considered the evidence in determining not to grant review of the ALJ's decision and placed it in the record, Tr. 2, the court is to "review the record as a whole, including the new evidence, in order to determine whether substantial evidence support[ed] the [ALJ's] findings." *Wilkins v. Sec'y, Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc).  The Commissioner notes that, "to the extent that Dr. Khan's

[post-ALJ decision] progress notes are relevant, they are only relevant in the context of considering the reasonableness of the ALJ's ultimate determination that Plaintiff was not disabled." Def.'s Br. 20. The Commissioner argues the new records do not support Plaintiff's argument. In reply, Plaintiff argues that, although the additional evidence is admittedly from visits after the date of the ALJ's decision, "these treatment notes most certainly relate to the period before the decision as they further detail that [Plaintiff] has ongoing serious mental impairments that have not successfully been resolved." Pl.'s Reply 3.

The court agrees with the Commissioner. Having considered the record as a whole, including the new evidence, the undersigned is of the opinion that the ALJ's decision is supported by substantial evidence. *See Wilkins*, 953 F.2d at 96. Plaintiff urges that the post-decisional records indicate Plaintiff's impairments were "ongoing" and had not been "successfully resolved." Pl.'s Reply at 3. However, the record contains no indication of Plaintiff's treatment between the August 21, 2009 administrative hearing/the ALJ's September 4, 2009 decision and the new records, which begin January 14, 2010. *Goodman v. Apfel*, No. 97-1361, 1998 WL 120148, *2 (4th Cir. Mar. 18, 1998) ("The opinion of a treating physician must be weighed in light of the record as a whole[.]").

The latter records simply do not render the ALJ's decision unsupported by substantial evidence. *See Smith v. Chater*, 99 F.3d 635, 638–39 (4th Cir. 1996) (affirming an ALJ's denial of benefits after reviewing new evidence presented to the Appeals Council because the court concluded that "substantial evidence support[ed] the ALJ's findings"), *quoted in Meyer v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011). Just because Plaintiff is depressed and anxious, and Dr. Khan is adjusting her medication in January 2010, does not mean that she was depressed and anxious, and Dr. Khan was adjusting her medication in April 2009, when he rendered his last

opinion, and indeed, the record reflects otherwise. Even if it were later determined that Plaintiff was disabled as of some later date, that would not mean that she was disabled during the relevant period. Plaintiff's additional evidence does not render the ALJ's decision unsupported by substantial evidence.

Plaintiff further refers to the opinion of a state agency consultant examiner, Dr. Robert Moss, that Plaintiff "would have a significant impairment in social functioning with moderate impairment [in] independent functioning." Tr. 409, *see* Pl.'s Br. 22-23. However, as the Commissioner noted, Dr. Moss performed an independent consultative examination in April 2006, Tr. 406-09—over one year before Plaintiff's AOD of July 15, 2007. Information in the administrative record indicates the Commissioner considered Dr. Moss's April 27, 2006 consultative examination in denying a prior DIB application. *See* Tr. 70 (Explanation of Disapproved Claim listing Dr. Moss's examination report, inter alia, as having been considered in determining and denying Plaintiff's prior claim); *see also* Tr. 60 (Aug. 10, 2006 Disability Determination and Transmittal form noting AOD of June 21, 2005 and indicating reconsideration denied); Tr. 66-69 (May 19, 2006 notice of disapproved claim as discussed in Tr. 70). Nothing in the record indicates the denial of the prior application has been reopened here. *Cf. Lively v. Sec'y of Health & Human Servs.*, 820 F.2d 1391, 1392 (4th Cir. 1987) (noting that "*res judicata* prevents reappraisal of both the [Commissioner's] findings and his decision in Social Security cases that have become final" (citing 42 U.S.C. § 405(h))). Accordingly, the ALJ did not err in failing to mention Dr. Moss's report.

Plaintiff also contends that the ALJ should have re-contacted Dr. Khan "to have him explain any perceived contradictions in his opinions, rather than assume that such contradictions exist," citing to 20 C.F.R. § 404.1512(e). Pl.'s Br. 20. However, as explained in *Jackson v.*

*Barnhart*, 368 F. Supp. 2d 504 (D.S.C. 2005), "the regulations impose a duty to recontact a treating physician only when the record is inadequate to make a determination of disability." 368 F. Supp. 2d at 507, n.1; *see also Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (noting the regulation's "important prerequisite" that a medical source will be recontacted for clarification if the evidence available is inadequate for Agency to determine whether claimant is disabled); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (finding duty to recontact "only when the evidence received is inadequate" to make a disability determination); *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (requiring recontact when the ALJ was faced with "an incomplete medical history"); *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (the ALJ is obligated to develop a claimant's medical history "where there are deficiencies in the record").

Here, Dr. Khan's records were not incomplete; rather, the ALJ found his opinions to be inconsistent with Dr. Khan's own state agency opinion and the record as a whole. *See* Tr. 21-22. Under these circumstances, the ALJ was under no obligation to recontact Dr. Khan. *See Jackson,* 368 F. Supp. 2d at 508.

Given the nature and limits of the court's review, and given the well-considered rationale of the ALJ, the court should not second-guess his decision. To the extent that the opinions conflicted, the duty to resolve the conflict rests with the ALJ, not with this court. *Smith*, 99 F.3d at 638. The court cannot now reweigh the evidence and substitute its judgment for the ALJ's. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).

### 2. Credibility

Plaintiff next complains that the ALJ erred in how he conducted the credibility assessment, finding Plaintiff's credibility "low." Tr. 22. In *Hines*, 453 F.3d 559, the Fourth Circuit Court of Appeals set out its standard governing the assessment of subjective complaints:

Once an underlying physical or ental (sic) impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

*Id.* at 564-65 (quoting SSR 90-1p (emphasis omitted)). The Fourth Circuit added that SSR 96-7p; 20 C.F.R. § 416.929(c)(1) and (c)(2); *Hunter v. Sullivan*, 993 F.2d 31, 36 (4th Cir.1992); and other successors to SSR 90-1p "establish a two step process that comports with applicable Fourth Circuit precedent." *Hines*, 453 F.3d at 565. According to the regulation,

(1) When the medical signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, (2) we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work.

20 C.F.R. § 404.1529(c)(1).[14]

The ALJ found that Plaintiff did have medically determinable impairments which could reasonably be expected to cause her alleged symptoms, but determined that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" his finding of residual functional capacity ("RFC"). Tr. 21; *see also* Tr. 20. Plaintiff seems to argue that, because she satisfied step one of the process, the ALJ should have simply accepted her testimony without question.

---

[14] 20 C.F.R. § 404.1529 is the DIB corollary to 20 C.F.R. § 416.929.

The first problem with this argument is that it would render the second of the two steps—evaluation of the claimant's subjective complaints—void, and such a construction is prohibited. *See, e.g.*, *PSINet, Inc. v. Chapman*, 362 F.3d 227, 232 (4th Cir. 2004) ("General principles of statutory construction require a court to construe all parts to have meaning[.]"); *United States v. Snider*, 502 F.2d 645, 652 (4th Cir. 1974) ("[A]ll parts of the statute must be read together, [not] interpreting one part so as to render another meaningless[.]" (citation omitted)).

In the Fourth Circuit, 20 C.F.R. § 404.1529 provides the authoritative standard for evaluating pain in disability determinations and further "incorporate[s] the standard set forth in section 423(d)(5)(A)." *Craig*, 76 F.3d at 593. This regulation emphasizes the importance of objective medical evidence:

> Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work. *We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.* However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work *solely* because the available objective medical evidence does not substantiate your statements.

20 C.F.R. § 404.1529(c)(2) (emphases added).

Section 404.1529 further states that the Commissioner, in "evaluating the intensity and persistence" of symptoms, will "consider all of the available evidence," including medical history, signs and laboratory findings, medical opinions, *and* statements from the claimant and others about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(c)(1). But then, in reaching the disability decision, the Commissioner will consider the claimant's statements "about the intensity, persistence, and limiting effects" of symptoms and evaluate the statements "in

relation to the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(c)(4).

Specifically, the Commissioner states:

> We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you.  Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, *can reasonably be accepted as consistent with the objective medical evidence and other evidence.*

*Id.* (emphasis added).

Nothing in 20 C.F.R. § 404.1529 indicates that the claimant's statements will be given any greater weight than "the objective medical evidence and other evidence;" indeed, it appears that, in a balancing of evidence, objective medical and other evidence is weighed more heavily, as the claimant's purported limitations need only be accepted to the extent that they are consistent therewith.  Thus, the *Craig* court explained that "objective medical evidence and other objective evidence" are *crucial* "to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work."  76 F.3d at 595.  Further,

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, *they need not be accepted to the extent they are inconsistent with the available evidence*, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers[.]

*Id.* (emphasis added) (*cited in Hines*, 453 F.3d at 565 n.3).

Here, the ALJ summarized Plaintiff's subjective complaints from her testimony:

> [S]he went into a depressive cycle when Hitachi closed down and she was laid off.  She later tried to work but quit due to bipolar affective disorder.  She was depressed, could not get out of bed, cried several times a month, did not want to be around people, and was nervous.  She further stated she had obsessive compulsive symptoms, manic depression and panic attacks.

Tr. 20. Plaintiff argues that recounting these symptoms, and Dr. Khan's diagnoses, are enough to support a disability finding, but this is a mis-reading of the law. *Hines* did not hold that the ALJ's evaluation stops at the claimant's subjective complaints but, rather, that the plaintiff's burden ends there. *See* 453 F.3d at 565 ("Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [Plaintiff] was entitled to rely exclusively on subjective evidence to prove the second part of the test[.]") (footnote omitted). *Hines* added, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence"—as the ALJ found here—"the adjudicator must consider *all of the evidence in the case record*, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 565 (emphasis added) (citing SSR 96-7p).

Unlike the ALJ in *Hines*, the ALJ here did not fully credit Plaintiff's subjective complaints "because a laundry list of objective indicators did not appear in Dr. [Khan's] medical records." 453 F.3d at 563. The ALJ, however, could rely on Plaintiff's statements that appear in Dr. Khan's records that are inconsistent with her testimony. *See* SSR 96-7p (a strong indication of credibility is the consistency, both internally and with other information in the case record, of the claimant's statements). Further, the ALJ could observe that Dr. Khan's objective notations were largely inconsistent with Plaintiff's statements at her hearing. *Cf. id.* ("A report of negative findings ... is one of the many factors that appropriately are to be considered in the overall assessment of credibility."). And the ALJ could note that Plaintiff's activities also belied her hearing testimony.[15] *See Hines*, 453 F.3d at 564 (noting that "'it is incumbent upon the ALJ to

_____

[15] Plaintiff complains that the ALJ's citation to her "occasional performance of activities of daily living, at her own pace, on an unscheduled basis, does not demonstrate the capability to sustain a 40-hour work week." Pl.'s Br. at 27. But the ALJ was not relying on her activities to support his RFC finding but, rather, to evaluate Plaintiff's statements about the effect of her symptoms upon

evaluate the effect of pain on a claimant's ability to function'" (quoting *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989)).

Although Plaintiff objects to the ALJ's reference to her substance abuse, it is relevant to her credibility evaluation. Plaintiff reported on her Administration "Disability Report" that she stayed at "Wellspring" for two nights in September 2007 "due to suicidal thoughts." Tr. 222-23. According to the medical records, she came for "detoxification from alcohol." Tr. 457. The admitting physician assessed her with alcohol abuse and dependence. Tr. 458. Plaintiff was discharged on the third day upon her request. Tr. 491. Plaintiff was supposed to report for outpatient treatment on September 24, 2007, Tr. 488-89, but there is no indication in the records that she did.

At her hearing, Plaintiff did not address her substance abuse until questioned by the ALJ. When the ALJ asked, "What about alcohol [use]?," Plaintiff replied: "I drank four beers in September of '07, because I went into a depressive cycle and my husband was at work. And I went and I drank four beers. And I got scared and I called my preacher and my doctor. And they came and got me." Tr. 52. But when questioned by the emergency room physician, Plaintiff answered that she had drank fifteen beers that day, and her blood alcohol level was 102 mg/dl (0.102%). Tr. 457, 462. When the ALJ pointed out the contradiction, Plaintiff pronounced the hospital record "not correct." Tr. 53.

According to the hospital records, Plaintiff said that she had been drinking sixteen beers per day for the previous six months, Tr. 457, or since approximately March 2007. Plaintiff

---

her ability to function. *See Johnson*, 434 F.3d at 658 (noting that claimant's routine activities, including reading, cooking, exercising, attending church, cleaning house, washing dishes, doing laundry, and visiting, were inconsistent with her complaints).

admitted that she had "lost one job" due to alcohol abuse,[16] and that she had left her job with

Carolina Central Vac due to "No Work."[17]  Tr. 466, 467.  She represented on an Administration

"Work History Report" that she worked for a "Central Vacuum Company" as an "on site helper"

from August 2006 through her AOD of July 15, 2007.  Tr. 228; *see also* Tr. 33 (last worked

6/27/05).  Plaintiff testified that she drew unemployment benefits from July 2007 through

September 2007.  Tr. 31.  She added that she stopped working for the vacuum company because,

> A couple of months before the end of that, I went into a depressive cycle and
> couldn't go into work for several days at a time and when I did go, I was just very
> depressed the whole time and all.  And we decided together that that would
> probably be about it for us for me there.

Tr. 34; *see also* Tr. 220 (stopped working because of her "condition," described without

reference to substance abuse).  When asked what caused her to stop working in mid-2007, she

answered that she was "rapid cycling" due to her bipolar disorder.  Tr. 37.  Plaintiff did not

mention her alcohol abuse which, by her own account, started while she was working for the

vacuum company and continued after she stopped working.

When Plaintiff first applied for DIB, in March 2006, she provided an AOD of June 21,

2005.  Tr. 161.  She did not disclose that she had received treatment for substance abuse.  *See*

Tr. 160-67.  She represented that she reported to the emergency room in July 2005 for

"Attempted suicide."  Tr. 164.  She also stated that she was "sent to Wellspring" in July 2005

because she was "suicidal."  Tr. 223.  But at her intake in September 2007, Plaintiff stated that

---

[16] At this intake assessment, Plaintiff also said that her relationships with her peers on her job and
with her supervisors were "always good."  Tr. 467.  She added that she had experienced panic or
anxiety attacks only when she was younger.  Tr. 469. These statements are contrary to her
representations to Dr. Khan, *see* Tr. 790, and to Dr. Moss, *see* Tr. 407-08.

[17] Plaintiff testified that she and her employer mutually agreed that she would no longer work due
to her depression.  Tr. 34.

she had never had suicidal thoughts or attempted suicide. Tr. 469. Also, upon admission to the emergency room in July 2005, she denied any suicidal ideation or thought, but admitted to abusing Lortab for the previous four years, Tr. 324, snorting cocaine twice a week for six months, and doing "crystal meth" daily for four weeks, Tr. 333. The examining physician determined that Plaintiff was not suicidal, and diagnosed her with polysubstance abuse. Tr. 325. She was supposed to follow-up with Wellspring later that morning, Tr. 325, 340, but there is no indication that she did. Apparently, Plaintiff was involved in polysubstance abuse during her last days of employment with Carolina Cardiology,[18] although she testified that she was "let go" because of an inability to focus, as she had "cycled into a mania stage." Tr. 34-35.

According to Plaintiff's 2006 Disability Report, she received inpatient and outpatient treatment for "Manic episode, car accident." Tr. 165. Plaintiff received admission to the Carolina Center for Behavioral Health on September 26, 2005, upon referral from her therapist for "increasingly bizarre behavior." *See* Tr. 346. She had indeed had a car accident, after multiple instances of falling asleep while driving. *See* Tr. 348, 363. According to the medical records, she "had been using Methamphetamines and marijuana. She had become acutely psychotic, disorganized and bizarre." Tr. 352. She reported that she seldom saw her psychiatrist and was noncompliant with her medications. Tr. 354. She denied "any history of suicide attempts." Tr. 348. Although the doctor found "vague suicidal ideation," her diagnoses were depression and drug abuse. Tr. 355. She was discharged on October 4 "for continued close monitoring." *Id.* Upon being discharged from outpatient care, her diagnoses remained depression and drug abuse. Tr. 345, 347. Although the ALJ did not perform the above analysis

---

[18] Plaintiff testified at the hearing before the ALJ that before working for Carolina Central Vacuum, she worked for one-and-one-half years as a secretary for Carolina Cardiology. Tr. 34.

in his decision, it clearly shows how he could conclude that Plaintiff "minimize[d] her past history of polysubstance abuse." Tr. 22.

### 3. Past Relevant Work and VE Testimony

At Step Four, the ALJ found Plaintiff was capable of performing her past work as a vacuum center helper. Tr. 22. The ALJ also made alternate findings, moving to Step Five of the sequential analysis. Tr. 22-23. The VE testified that other jobs existed in the national economy that Plaintiff could perform, and the ALJ found Plaintiff was "capable of making an adjustment to other work that exists in significant numbers in the national economy." Tr. 23.

In the midst of her argument regarding the ALJ's credibility analysis, Plaintiff makes a general argument that the ALJ erred by finding she could perform her PRW as a vacuum center helper. Pl.'s Br. 28. Plaintiff argues the ALJ erred by failing to make specific findings as to similar jobs and by failing to consider the demands of that work. *Id.* Plaintiff's next allegation of error focuses on the ALJ's consideration of the VE's testimony. Pl.'s Br. 29-30.

The court finds no merit to Plaintiff's brief argument that the ALJ erred in finding at Step Four that she could return to her PRW. As an initial matter, Plaintiff seems to imply that the ALJ should have found jobs similar to Plaintiff's PRW existed in the local or national economy. Pl.'s Br. 28. That is not the law. The regulations provide that the Agency "will not consider [at Step Four]. . . whether [claimant's] past relevant work exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(b)(3); *see also* 20 C.F.R.§§ 404.1520(a)(4)(iv), (v) (describing steps four and five of the sequential evaluation process).

In addition, consistent with the applicable regulations and law, the ALJ consulted a VE. *See* 20 C.F.R. § 404. 1560 (b)(2) (we may use the services of a vocational expert to obtain evidence we need to help us determine whether you can do your past relevant work, given your

residual functional capacity); *Fisher v. Barnhart*, 181 F. App'x 359, 365 (4th Cir. 2006). The vocational expert testified that, based on the ALJ's RFC finding, Plaintiff could perform her PRW as a vacuum center helper. Tr. 22, 55. The VE further testified that Plaintiff's PRW did not require interaction with the general public. Tr. 55. Therefore, substantial record evidence supports the ALJ's finding that Plaintiff could perform her PRW.

The ALJ also made an alternative Step Five finding, Tr. 23, which Plaintiff also challenges, Pl.'s Br. 29-30.

Once the claimant reaches step five of the sequential evaluation, the Commissioner bears the burden of providing evidence of a significant number of jobs in the national economy that a claimant could perform. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). "The purpose of bringing in a [VE] is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." *Walker v. Bowen*, 889 F.2d at 50 (citation omitted). "'[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments.'" *Hines*, 453 F.3d at 566 (quoting *Walker*, 899 F.2d at 50)). The hypothetical need only reflect those impairments supported by the record. *See Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (quoting *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)); *see also Howe v. Astrue*, 499 F.3d 835, 842 (8th Cir. 2007); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006); *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *Shepherd v. Apfel*, 184 F.3d 1196, 1203 (10th Cir. 1999).

At the administrative hearing, the ALJ proposed a hypothetical individual of Plaintiff's age, education and work history, who had the physical RFC to perform work at all exertional

levels with only postural physical limitations. Tr. 54. The hypothetical claimant additionally had mental limitations where "she'd be limited to simple, routine, repetitive tasks ["SRRTs"] for about two-hour periods with no required ongoing interaction with the public which would allow for frequent interaction with the public." Tr. 54–55. The VE answered that such an individual would be able to perform Plaintiff's PRW as an on-site helper, but also work as a housekeeper and in "some grading occupations." Tr. 55. The ALJ then modified the hypothetical such that, instead of "a lot of interaction with the public," the individual would "be limited to occasional interaction." *Id* The VE assured him that the hypothetical claimant could perform the same jobs. For his last hypothetical, the ALJ substituted an individual would "could not concentrate, persist and work at a pace to do even [SRRTs] for two-hour periods." Tr. 56. The VE responded that there would be no work for such an individual.

Plaintiff complains that, if the ALJ had properly given controlling weight to Dr. Khan's opinion (presumably, the January 2009 opinion), based on the VE's response to the last hypothetical, there would be no work that Plaintiff could perform. The ALJ, however, relied on Dr. Khan's state agency opinion, and this decision has been found to have substantial support in the record. Because the ALJ failed to adopt the more severe limitations, he was not required to include them in his hypothetical. A hypothetical need only include impairments that are supported by the record and which the ALJ accepts as valid. *Russell*, 58 F. App'x at 30. Accordingly, this allegation of error should be dismissed.

III. Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the

foregoing, the undersigned cannot determine that the Commissioner's finding is unsupported by substantial evidence or contains legal error.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

June 22, 2012                                         Kaymani D. West
Florence, South Carolina                             United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**